[Cite as *Dunning v. Varnau*, 2017-Ohio-7207.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| GEORGE DUNNING, et al., | : | CASE NOS. CA2016-09-017 |
| Plaintiffs-Appellees/Cross-Appellants, | : | CA2016-10-018 |
| | : | O P I N I O N |
| - vs - | : | 8/14/2017 |
| JUDITH A. VARNAU, | : | |
| Defendant-Appellant/Cross-Appellee. | : | |
| | : | |

CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CVH2015-0001

John H. Phillips, Anthony B. Holman, 9521 Montgomery Road, Cincinnati, Ohio 45242, for appellees/cross-appellants, George Dunning, Jason Huff, John Schadle, Bradley Schadle, & Ryan Wedmore

David R. Kelley, Mark R. Weaver, Special Prosecuting Attorneys, 110 West Main Street, West Union, Ohio 45693, for appellees, Dwayne Wenninger, Felicia Landacre, Sarah McKenzie, and Wayne Bingaman

David M. Gast, Niroshan M. Wijesooriya, 2717 Observatory Avenue, Cincinnati, Ohio 45208, for appellees, Wayne Bingaman, Sarah McKenzie and Felicia Landacre

Thomas G. Eagle, 3400 North State Route 741, Lebanon, Ohio 45036, for appellant/cross-appellee

**PIPER, J.**

{¶ 1} Defendant-appellant/cross-appellee, Judith Varnau, appeals a decision of the

Brown County Court of Common Pleas issuing an injunction after finding in favor of plaintiffs-

appellees/cross-appellants, George Dunning and other employees of the Brown County Sheriff's Office ("Plaintiffs"). Plaintiffs also appeal the same court's decision specific to the amount of attorney fees granted in their favor.

{¶ 2} In 2013, Zachary Goldson was an inmate at the Brown County Jail. During his incarceration, Goldson tied a bedsheet to the overhead sprinkler system in his jail cell and hung himself. At the time, Judith Varnau was the Brown County Coroner. However, the autopsy occurred in Montgomery County, and the coroner there confirmed that Goldson's death was a result of "hanging by the neck."

{¶ 3} Goldson had a history of suicidal behavior, including swallowing pens, toothbrushes, and staples, as well as discussing his preferred burial clothing. Goldson's sister and girlfriend both stated that Goldson was suicidal and had threatened to harm himself on multiple occasions.

{¶ 4} On the night of Goldson's suicide, he was transported to the hospital after he swallowed several items. During the transport, Goldson assaulted a police officer by grabbing him from behind, trying to reach the officer's weapon, and ultimately causing serious cuts on the officer's face. The officer struggled with Goldson, and four bystanders aided the officer in subduing Goldson. Goldson was quickly returned to the jail, and left alone in his cell for 23 minutes and 42 seconds before officers discovered Goldson's body hanging from the sprinkler system.

{¶ 5} An investigation by the Ohio Bureau of Criminal Investigation ("BCI") confirmed that Goldson's death was suicide. As part of the investigation, the prison provided BCI with video surveillance of the hallway outside of Goldson's cell. No one is seen on the video coming or going from Goldson's cell for the 21 minutes prior to his suicide. Even so, Varnau and her husband, Dennis, espoused the belief that members of the Brown County Sheriff's Office killed Goldson by strangling him with a ligature and staging the hanging to look like a

suicide. Varnau alleged that police killed Goldson in retaliation for Goldson's assault on the officer during his transport to the hospital. In her official capacity as Brown County Coroner, Varnau indicated on Goldson's death certificate that his death was caused by strangulation and that the death was a homicide.

{¶ 6} Varnau created a slide presentation, which included allegations and "evidence" regarding Goldson's death. The presentation was shown to the grand jury, who decided not to indict anyone in connection with Goldson's death. Nevertheless, Varnau announced her plans to conduct a second inquiry into Goldson's death to "clarify" her finding of homicide. The allegations made by Varnau against the Brown County Sheriff's Office were publicized on local news channels and the internet, and Varnau's allegations against the sheriff's office became widely known.

{¶ 7} Varnau and her husband have a history of dispute with the Brown County Sheriff's Office. Dating back to 2008 when Dennis ran against the current sheriff, Dwayne Wenninger, the Varnaus and the sheriff's office have been engaged in a very public feud. *See Adamson v. Coroner*, 12th Dist. Brown No. CA2014-07-016, 2014-Ohio-5739. Dennis claimed that Sheriff Wenninger was not qualified to be sheriff, and filed suit to oust Wenninger from office. This court denied Dennis' attempt to oust Wenninger, and the feud between the parties continued. *State ex rel. Varnau v. Wenninger*, 12th Dist. Brown No. CA2009-02-010, 2011-Ohio-3904.

{¶ 8} After Varnau published the slideshow with her allegations, several members of the Brown County Sheriff's Office filed suit against Varnau and Dennis in federal court for defamation and related causes of action. The administrator for Goldson's estate also filed a federal suit against the Brown County Sheriff's Office and individual employees, essentially claiming wrongful death and mistreatment of a detained person.

{¶ 9} Varnau continued to investigate Goldson's death, and served six subpoenas on

members of the Brown County Sheriff's Office, who are Plaintiffs in the current appeal. Plaintiffs then filed suit against Varnau, asking the court to enjoin her second investigation, and to specifically (1) declare that Varnau lacked authority to issue the subpoenas, and (2) grant prohibitory injunctive relief from having to comply with the subpoenas.

{¶ 10} Plaintiffs also asked for a temporary restraining order ("TRO") to maintain the status quo until the proceedings were complete. The trial court granted the TRO, finding that there was enough doubt as to Varnau's authority to conduct the second investigation to require maintaining the status quo. Four days after Varnau received the TRO, she subpoenaed the company that made the overhead sprinkler system from which Goldson hung himself. Varnau then used Brown County funds to test the sprinkler equipment she received from the company.

{¶ 11} Despite the TRO, Varnau took other actions in furtherance of her investigation, including: creating a "Coroner Inquest Page" on her official website, inviting the public to submit information to her, soliciting information about Goldson's death in a Georgetown, Ohio, online news forum called Topix, sending a public records request to the Brown County Sheriff to request the contact information of the manufacturer from whom the sheriff purchased the bed sheets from which Goldson hung himself, and publishing an hour-long presentation online titled "PENDING 2015 INQUEST REPORT," wherein she concluded the cause of Goldson's death was homicide by strangulation.

{¶ 12} The trial court held a full hearing and determined that Varnau had statutory authority to investigate a death, but that such investigation was authorized only within the six months following Goldson's death. As such, the trial court determined that Varnau lacked the authority to perform a second investigation where such occurred over a year after Goldson's death. When Varnau continued to request information regarding Goldson's death, a magistrate determined that Varnau could not seek the information given the trial court's

ruling, and the trial court adopted the magistrate's decision.

{¶ 13} Thereafter, the trial court scheduled a hearing on the request to permanently enjoin Varnau's investigation. The trial court prohibited Varnau from "conducting any further Inquest into the death of Zachary Goldson," and "conducting any investigation whatsoever in the Death of Zachary Goldson during the pendency of these proceedings." Before the final hearing, the parties engaged in discovery, and Varnau asked for materials specific to Goldson's death. Plaintiffs moved the court to protect themselves against Varnau's request for discovery, arguing that the materials she requested where the same Varnau wanted to use in her investigation of Goldson's death. The trial court agreed, and ruled that Varnau was not entitled to the requested discovery.

{¶ 14} The trial court held a final hearing on the matter, and ruled in favor of Plaintiffs by issuing a permanent injunction against Varnau regarding her investigation into Goldson's death. In addition to the permanent injunction, the trial court also awarded $7,500 in attorney fees to Plaintiffs against Varnau personally.

{¶ 15} Varnau now appeals the trial court's decision, raising four assignments of error. Plaintiffs appeal the same trial court's decision, specific to the amount of attorney fees awarded. For ease of discussion, we will combine Varnau's first three assignments of error together, as they are interrelated. We will then address Varnau's fourth assignment of error and Plaintiffs' single cross-assignment of error together, as those issues are also interrelated.

{¶ 16} However, before we address the assignments of error, we note that Plaintiffs have raised a challenge to Varnau's standing given that she is no longer coroner after her term expired in January 2017. Plaintiffs argue that the current coroner does not want to pursue the appeal, and that the current coroner is the only person who has standing to seek permission to continue an investigation into Goldson's death.

{¶ 17} According to the Ohio Supreme Court, standing is a "jurisdictional

requirement." *Fed. Home Loan Mortg. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, ¶ 22. "It is an elementary concept of law that a party lacks standing *to invoke the jurisdiction* of the court unless he has, in an individual or representative capacity, some real interest in the subject matter of the action." *Id.* (Emphasis sic.) "Because standing to sue is required to invoke the jurisdiction of the common pleas court, 'standing is to be determined as of the commencement of suit.'" *Id.* at ¶ 24, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570-571, 112 S.Ct. 2130, fn. 5 (1992).

{¶ 18} The law is clear that a *plaintiff* must have standing to bring a suit. Thus, if a challenge is based on standing, the focus of that inquiry is on the plaintiff, not the defendant. At the time Plaintiffs initiated the suit, they had standing, and that standing has not disappeared simply because Varnau is no longer coroner. Moreover, and although Varnau's term in public office has since expired, she was coroner at the suit's inception and was defending against Plaintiffs' claims that she did not have a right to pursue an investigation into Goldson's death. As such, Varnau was the proper party to the action and may appeal the court's decision.

{¶ 19} Assignment of Error No. 1:

{¶ 20} THE TRIAL COURT ERRED IN GRANTING THE PROTECTIVE ORDER ON DISCOVERY.

{¶ 21} Assignment of Error No. 2:

{¶ 22} THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF THE CIRCUMSTANCES OF GOLDSON'S DEATH.

{¶ 23} Assignment of Error No. 3:

{¶ 24} THE TRIAL COURT ERRED IN QUASHING CORONER SUBPOENAS AND GRANTING A PERMANENT INJUNCTION.

{¶ 25} Varnau argues in her first three assignments of error that the trial court erred by granting the permanent injunction to prohibit her from investigating Goldson's death, and that she should have been permitted to perform discovery.

{¶ 26} Injunctive relief is an equitable remedy that is available only where there is no adequate remedy at law. *Haig v. Ohio State Bd. of Edn.*, 62 Ohio St.3d 507, 510 (1992). To obtain a permanent injunction, a party must show by clear and convincing evidence that immediate and irreparable injury, loss, or damage will result to the applicant. *McNamara v. Wilson*, 12th Dist. Butler No. CA2013-12-239, 2014-Ohio-4520. Irreparable harm is an injury for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete. *1st Natl. Bank v. Mountain Agency, L.L.C.*, 12th Dist. Clermont No. CA2008-05-056, 2009-Ohio-2202, ¶ 47. A court may issue an injunction when a coroner is attempting to conduct his or her statutory authority in a manner which is arbitrary, "clearly untenable," or "unreasonable." *State ex rel. Harrison v. Perry,* 113 Ohio St. 641, 649 (1925).

{¶ 27} The decision whether to grant or deny an injunction is a matter solely within the discretion of the trial court and a reviewing court should not disturb the judgment of the trial court in the absence of a clear abuse of discretion. *Battelle Mem. Inst. v. Big Darby Creek Shooting Range*, 192 Ohio App.3d 287, 2011-Ohio-793 (12th Dist.). An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette Nos. CA2015-01-001 and CA2015-01-002, 2015-Ohio-4452.

**A Coroner's Statutory Authority**

{¶ 28} According to R.C. 313.17, a coroner has the right to issue subpoenas, and such right will be enforced by the courts, as part of the coroner's investigation into a

decedent's death. R.C. 313.19 provides that the coroner's finding is the legally accepted cause of death unless the court of common pleas directs the coroner to change the decision as to cause, manner, and mode of death. However, no statutory authority exists to authorize a coroner to conduct a subsequent or second inquest to prove or verify his or her determination as to the cause of death already recorded on a death certificate.

{¶ 29} The record indicates that no one petitioned the trial court to direct the coroner to change the method of death on Goldson's death certificate as of the time of the injunction. Furthermore, Varnau admitted that she had not changed her mind regarding the cause of death, nor had she encountered additional information or evidence that raised doubt in her mind as to the cause of death. Varnau even testified that she did not wish to change the cause of death on Goldson's certificate, and instead, she wanted to confirm her original findings and indication on the certificate. On an internet site advertising Varnau's second inquest, the following "Press Release" is included:

> Now that the Special Prosecutor and BCI's investigation has been completed, my office has started planning for what will be necessary to conduct a coroner's inquest into the Zachary Goldson case. Since LE's investigation has determined that Zachary Goldson's death was "suicide," and the coroner's determination was "homicide," sooner or later a court will have to decide which manner of death is appropriate for this case. With that in mind, the coroner's office will hold its own inquest for a more thorough review of all information pertaining to Mr. Goldson's death in order to prepare for the future court hearing on this matter.

{¶ 30} However, the information Varnau tried to subpoena in her second inquest was wholly irrelevant to Goldson's cause of death, such as the Brown County Sheriff's Office retention policy and personal cell phone logs from employees of the sheriff's office.[1] The trial

---

1. We also note that Varnau's discovery requests specific to this case, which were prohibited by the trial court, sought the same information that Varnau sought in her investigation of Goldson's death. As such, the trial court properly granted Plaintiffs' protective order because Varnau was not permitted to obtain information whether as coroner or as defendant in this case.

court called Varnau's attempt to subpoena this information a "fishing expedition" that "certainly exceeds any power or duty of the coroner."  We agree.

{¶ 31}  Moreover, and according to Ohio Adm.Code 3701-5-07, a coroner has six months to conclude an investigation into a decedent's death and certify the cause of death. The record is undisputed that Goldson died on October 5, 2013.  Thus, Varnau's six-month time frame for investigation and certification expired as of April 5, 2014.  Yet, she tried to conduct an inquest and issued subpoenas in December 2014.  Therefore, Varnau lacked authority not only because she had already recorded the cause of death on Goldson's death certificate, but also because she tried to further investigate more than six months after Goldson's death.[2]  We therefore find the trial court properly granted the permanent injunction to stop Varnau from investigating the cause of Goldson's death where she patently lacked the authority to so investigate.

**Scope of Injunction**

{¶ 32}  The trial court's permanent injunction stated the following: "Therefore, The Court hereby permanently enjoins the Defendant Brown County Coroner from issuing or enforcing any subpoenas that concern the death of Zachary Goldson.  She is further enjoined from engaging in any activity whatsoever concerning the mode, manner and cause of death of Zachary Goldson."

{¶ 33}  Varnau first argues that the scope of the injunction prohibits her from performing discovery for the federal suit in which she is a defendant.  While there are currently federal cases now pending regarding Goldson's death, including causes of action

---

2. For the same reasons, the trial court correctly limited the scope of evidence by not having Varnau testify and admit evidence about her allegations of suspicious events causing Goldson's death.  As stated herein, the information regarding Goldson's death was not relevant to whether Varnau could investigate his death in her official capacity as coroner where she had already determined the official cause of death on Goldson's death certificate and more than six months had passed since Goldson's death.  Nothing Varnau could have submitted as evidence or testimony would have changed Ohio law regarding the authority vested in coroners and the time frames in which such authority applies.

alleging defamation and wrongful death, the trial court indicated that its injunction was specific to the Brown County Coroner investigating Goldson's death. The trial court, however, neither enjoined Varnau personally from seeking discovery in her federal case, nor prohibited Varnau from doing an investigation specific to the pending federal cases in which she was involved.

{¶ 34} Varnau also argues that the trial court's injunction impacts her as an individual, not just as the coroner, because the pronoun "she" is used to reference her in the injunction. However, the trial court used the "she" pronoun after first clearly identifying Varnau as the Brown County Coroner, and the pronoun does not change the order from being issued against Varnau in her official capacity as coroner to being issued against Varnau as an individual or private citizen. As such, the injunction's scope was limited to Varnau while in her official capacity as coroner, and does not prohibit Varnau from participating in any federal case as a private citizen.

**Injunction Properly Ordered**

{¶ 35} After a full review of the record, the trial court did not abuse its discretion in issuing the permanent injunction against Varnau. The record is clear that Varnau engaged in a pattern of activity, such as subpoenaing evidence and testimony, to bring about a second inquiry into Goldson's death. The information sought by Varnau, even if she had been authorized to investigate Goldson's death, was irrelevant to determining the cause of death. This is especially true where Varnau admitted that no new evidence was available concerning the mode, manner, and cause of death and where Varnau did not have any statutory authority to engage in an investigation once the method of death was determined and more than six months had passed since Goldson's death. Exceeding her authority was resulting in irreparable harm for which there was no other adequate remedy at law.

{¶ 36} Plaintiffs, including those Varnau subpoenaed as part of her subsequent

investigation, were suffering harm because they continued to be either directly implicated or accused of being complicit in Goldson's death. This harm is especially irreparable where law enforcement officers were subject to accusations that they killed an inmate. Such accusation from a public official would have a direct impact on the citizens of Brown County and the way they view their police force. There is no doubt that such accusations would harm the officers' reputations and impact public trust in the Brown County Sheriff's Office as a whole. *See Fischer Dev. Co. v. Union Twp.*, 12th Dist. Clermont No. CA99-10-100, 2000 Ohio App. LEXIS 1873, *16 (May 1, 2000) ("Matters concerning reputation can constitute irreparable harm for which there is no adequate remedy at law").

{¶ 37} We also note that Brown County citizens are entitled to an elected public official who is aware of his or her responsibilities, duties, and rights. Further, an elected official who does not abide by his or her statutory authority causes harm to the detriment of the county and its citizens. As such, the injunction in this case was warranted to prohibit the coroner from exceeding her statutory authority. *See Garono v. State*, 37 Ohio St.3d 171 (1988) (deeming an injunction the proper method to stop officials from unwarranted actions that go beyond his or her authority or duty).

{¶ 38} Having found that the trial court properly issued the permanent injunction, and that the scope of the injunction is proper, we overrule Varnau's first three assignments of error.

{¶ 39} Varnau's Assignment of Error No. 4:

{¶ 40} THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES FOR THE DISPUTED DISCOVERY REQUESTS.

{¶ 41} Plaintiffs' Cross-Assignment of Error:

{¶ 42} THE TRIAL COURT SHOULD HAVE AWARDED FULL ATTORNEYS' FEES FOR APPELLANT'S BLATANT VIOLATION OF THE INJUNCTION.

**{¶ 43}** Varnau and Plaintiffs both appeal the trial court's order awarding Plaintiffs $7,500 in attorney fees after finding that Varnau deliberately violated the temporary injunction by issuing subpoenas after the TRO went into effect.

**{¶ 44}** An appellate court reviews a trial court's determination regarding attorney fees for an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). Determining the reasonableness of attorney fees involves a two-step process. *Bergman Group v. OSI Dev., Ltd.*, 12th Dist. Clermont No. CA2009-12-080, 2010-Ohio-3259. First, the trial court must calculate the number of hours reasonably expended on the case multiplied by a reasonable hourly rate. *Id.* The calculation provides the trial court with an objective, initial estimate of the value of the attorney's services. *Id.* Unreasonably expended hours are not included in the calculation, which include hours that are duplicative, redundant, unnecessary, or excessive. *Stonecreek Dental Care*, 12th Dist. Fayette Nos. CA2015-01-001 and CA2015-01-002, 2015-Ohio-4452. Secondly, the trial court may modify its initial calculation after contemplating the factors set forth in Prof.Cond.R. 1.5. *Bergman Group* at ¶ 70.

**{¶ 45}** Factors in Prof.Cond.R. 1.5(a) include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;

- 12 -

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

**{¶ 46}** After reviewing the record, we find that the trial court did not abuse its discretion in awarding attorney fees as it did. Plaintiffs' counsel submitted an affidavit asking for $22,170 in attorney fees related to the protective order. Varnau then filed a memorandum in opposition, and Plaintiffs claimed additional fees of $3,528 for their counsel to prepare a reply memorandum.

**{¶ 47}** The trial court determined that the protection order request was not an "overwhelming task" and that prosecuting the request for the protection order would not reasonably take as many hours as that claimed by Plaintiffs' counsel. For example, Plaintiffs' affidavit included a charge of $300 per hour for their counsel to drive a motion or memorandum to the court. The trial court noted, and we agree, that such was unreasonable given that counsel could have sent the motions by ordinary mail, by courier, or some other manner costing less than $300 per hour.

**{¶ 48}** Moreover, the record is patently clear that the parties were well-aware of the facts and circumstances leading up to the protective order request, and were well-versed in the procedural history of the case in relation to Varnau's request versus the trial court's TRO. While the facts and issues related to the case at bar are somewhat unique and numerous, there is nothing exceptional or copious related to filing a protection order when the facts are well-known and the parties have been dealing with the same issues over the course of prolonged litigation.

**{¶ 49}** The issue was straightforward: Varnau was requesting information that was prohibited by the trial court's TRO. Nothing related to the issue indicated that excessive time and labor were required, that the questions involved in the protection order were novel or

difficult, or that obtaining the order required any greater skill from Plaintiffs' attorney than normal.

{¶ 50} The trial court determined that the rate Plaintiffs' counsel charged, $300 per hour, was reasonable, and that the reasonable time to obtain the protective order was 25 hours. We find no abuse of discretion in the trial court's order. As such, Varnau's fourth assignment of error and Plaintiff's sole cross-assignment of error are overruled.

{¶ 51} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.